## CONNECTICUT LIGHT & POWER CO. v. FEDERAL POWER COMMISSION.

### No. 8341.

United States Court of Appeals
District of Columbia.

Argued Dec. 8, 1943.
Decided Feb. 28, 1944.

---

Mr. Claude R. Branch, of Boston, Mass., for petitioner. Mr. John L. Hall, of Boston, Mass., also entered an appearance for petitioner.

Mr. Howard E. Wahrenbrock, Assistant General Counsel, of Washington, D. C., with whom Messrs. Charles V. Shannon, General Counsel, Louis W. McKernan, Principal Attorney, and Howell Purdue, all of the Federal Power Commission, all of Washington, D. C., were on the brief, for respondent.

Before MILLER, DOBIE,* and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

The Federal Power Commission after extensive hearings found that the petitioner, The Connecticut Light and Power Company, was a public utility within the meaning of the Federal Power Act, 16 U.S.C.A.

---

* Sitting by assignment of the Chief Justice of the United States, pursuant to the provisions of the Act of December 29, 1942,

28 U.S.C.A. § 17 et seq., entitled "An Act to amend the Judicial Code to authorize the Chief Justice of the United States to

§ 791a et seq., and ordered it to comply with the uniform system of accounts prescribed by the Commission under Section 301 of the Act. The case is before us for a review of the finding and order of the Commission. Since it is conceded that the petitioner must comply with the order if it is a public utility under the Act, the sole question before us is whether the finding of the Commission to that effect is sustained by substantial evidence and by a correct interpretation of the law.[1]

The Connecticut Light and Power Company distributes electricity to a substantial part of the State of Connecticut, including 107 towns, cities and boroughs with a total population of 660,000, and about 130,000 additional consumers served by other Connecticut utilities which purchase electric current from the petitioner. On the Saturday before the Monday on which the Act took effect petitioner was unquestionably engaged in the interstate transmission of electric energy as defined by the Act. It

---

assign circuit judges to temporary duty in circuits other than their own."

[1] Statutes Involved.

Federal Power Act, 49 Stat. 847, 16 U. S.C.A. § 824(a).

"Part II—Regulation of Electric Utility Companies Engaged in Interstate Commerce.

"Declaration of policy; application of part; definitions.

"Section 201. (a) It is hereby declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this Part and the Part next following and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

"(b) The provisions of this Part shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part and the Part next following, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

"(c) For the purpose of this Part, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

"(d) The term 'sale of electric energy at wholesale' when used in this Part means a sale of electric energy to any person for resale.

"(e) The term 'public utility' when used in this Part or in the Part next following means any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part."

Federal Power Act, 49 Stat. 854, 16 U. S.C.A. § 825(a).

"Part III—Licensees and Public Utilities; Procedural and Administrative Provisions.

"Accounts, records, and memoranda.

"Section 301. (a) Every licensee and public utility shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this Act, including accounts, records, and memoranda of the generation, transmission, distribution, delivery, or sale of electric energy, the furnishing of services or facilities in connection therewith, and receipts and expenditures with respect to any of the foregoing: Provided, however, That nothing in this Act shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by licensees and public utilities and may classify such licensees and public utilities and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof."

was a member of the Connecticut Valley Power Exchange for the interchange of electric energy between companies in Massachusetts, Connecticut and New York. Its facilities were designed so that this interchange of energy created substantial savings and constituted the most efficient use of the system. In a last minute effort to avoid Federal jurisdiction the petitioner severed its main interstate connection in spite of the fact that this added to the cost of furnishing electricity to consumers in Connecticut. It was, however, unable to sever all its interstate connections and it is on these remaining connections that the government rests its case.

The principal connections which remained after the passage of the Act were (1) with an interstate line from Massachusetts owned by the Connecticut Power Company (a separate organization) which is tapped by the petitioner; and (2) with facilities which transmitted electric energy to Fishers Island in New York until 1941. We will consider the effect of these interstate connections separately.

*The Power Line from Massachusetts Tapped by the Petitioner.*

 The Connecticut Power Company in the operation of the Connecticut Valley Power Exchange supplies energy from various plants in Massachusetts to an interstate power line which is tapped in Connecticut by petitioner to supply East Hampton, Torrington-Winsted and Bristol. While there are sources of supply within the state for these communities, meter readings taken by the government show that a substantial amount of current reaches these communities from this interstate power line. We need not consider seriously the contention of the petitioner that scientifically conclusive proof of interstate transmission of energy is impossible because, as testified by petitioner's experts, "with all the information it is ever going to be possible for us to obtain, nobody is ever going to answer the question in a unique way as to which load the power from a particular station goes to". A distinction between electric current as measured on a meter and electric energy was certainly not within the contemplation of Congress when it passed the Act; indeed, no scientist knows what the nature of electric energy is. Ordinary meter readings which measure electric current are sufficient data on which to make charges for electricity to users. That they are equally sufficient to determine the interstate transmission of energy under the Federal Power Act is shown by the case of Jersey Central Power & Light Co. v. Federal Power Commission, 1943, 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258.

A more serious question which petitioner raises is whether the ownership of facilities in Connecticut for tapping an interstate line in order to supply power to local communities is sufficient to make it a public utility. Petitioner contends that such facilities are not within the jurisdiction of the Commission because they are used in local distribution. Petitioner's argument runs as follows: It is not required to keep accounts unless it is a "public utility". [Section 301] A public utility is any person who owns or operates facilities subject to the *jurisdiction* of the Commission. [Section 201(e)] The Commission does not have *jurisdiction,* except as specifically provided, over facilities used in local distribution. [Section 201(b)] While the Act specifically provides for the keeping of accounts on facilities in local distribution it does not specifically provide for *jurisdiction* over such local facilities. [Section 301] From this it is argued that even though the energy which petitioner distributes comes from another state it is not a public utility under the jurisdiction of the Commission because the facilities which it owns are for local distribution.

 Such a construction is a grammatical possibility. However, it contradicts the broad purpose of the Act to correct abuses of write-ups, inflation of accounts and similar practices which have on occasion been found in the utility industry. It would permit a company which operated facilities that were normally designed for the interstate transmission of electric power to split itself into segments, one of which owned the power line and the other the distribution system. By such artificial corporate manipulation the Federal Power Commission would get jurisdiction over the tail of what was in fact an interstate set-up (to wit: the high voltage line), and lose jurisdiction over the dog (the main distribution system). It would encourage the setting up of unnecessarily complicated accounting systems between the owners of the segments of the artificially divided power system, which the Act is designed to eliminate. The Federal Power Act obviously intends to confer Federal jurisdiction upon electric distribution systems which normally would operate as interstate businesses. It

18

is not an act to put a premium on artificial corporate reorganization. It is not surprising, therefore, that the construction urged by the petitioner has been expressly overruled in the case of Hartford Electric Light Co. v. Federal Power Commission, 2 Cir., 1942, 131 F.2d 953, certiorari denied, 1943, 319 U.S. 741, 63 S.Ct. 1028. The opinion of Judge Frank in that case analyzes the provisions of the Act so well that we need not repeat it here. He reaches what seems to us the proper conclusion that Section 201 (b) means to give the Commission jurisdiction over any facility for the transmission of electric energy in interstate commerce. The "but" clause in the section is intended to make it clear that this jurisdiction extends even to local facilities where the Act provides for their regulation, as it does in the case of accounting practices.

Therefore, whether or not the facilities by which petitioner distributes energy from Massachusetts should be classified as "local" is not relevant to this case. The sole test of jurisdiction of the Commission over accounts is whether these facilities, "local" or otherwise, are used for the transmission of electric energy from a point in one state to a point in another.[2] Since actual meter readings in this case show such an interstate flow of current to supply petitioner's facilities it is a public utility under the Act.

The only alternative to such a conclusion is to adopt the argument of the petitioner that a point can be selected in the instantaneous transmission of energy from Massachusetts to Connecticut where interstate transmission ends and intrastate transmission begins. Petitioner suggests that point can be found at the station where it taps the admittedly interstate line. This theory assumes that electricity is carried in little buckets. The owner of the interstate line carries the bucket on its interstate journey and hands it to the petitioner in Connecticut. And thus the transmission of electricity is made to look like the sale of a pair of shoes. This conception contradicts all we know about electrical transmission. It is the kind of mythological offspring of a union between the law and

the natural sciences that makes scientists (except expert witnesses) tear their hair. It is true that such myths cannot be avoided as the vehicle of judicial discussion in many cases,—for example where the issue is the limits of taxing power between Federal and State governments. But those are cases where it is apparent that Congress intended the courts to use such artificial conceptions. We believe it was to escape this legal-electric mythology that the Federal Power Act made the test of jurisdiction depend, not on the current definition of "interstate commerce" but on the actual transmission of electric energy from one state to another without regard to the mechanical means of that transmission. This language gives us no excuse for indulging in the bucket theory of electrical transmission or for differentiating between the different kinds of equipment over which the energy flows in its instantaneous passage from a generator in one state to a consumer in another. It makes the test of whether such energy is actually transmitted between the two states the simple and practical one of reading a meter.

The adoption of this test, based on the underlying purpose of the Act, compels us to give serious consideration to petitioner's argument that it is being used here to defeat the purpose of the Act by giving the Commission jurisdiction over a system that is essentially intrastate because of some trivial or temporary connection from the outside. We do not believe Congress intended that a large electric power system which was essentially intrastate in character should come under Federal jurisdiction because of some insignificant or temporary outside connection. But if we keep the purpose of the Act in mind we can avoid unreasonable extensions of Federal jurisdiction. The court needs only to look at the character of the organization and its facilities in order to determine whether it can reasonably be classified as an interstate system. Intelligent interpretation of the Act does not bind us to a rule of thumb.

In the case before us the history of petitioner's operations removes all doubt as to its essentially interstate character.

---

[2] There is a superficial inconsistency between the above statement and the concluding phrase in Section 201(a) "* * *, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." This limitation, however, has been held by the Supreme Court of the United States not to apply to the sections of the Act which specifically give the Federal Power Commission jurisdiction over matters of financial arrangement, such as the accounting section which we are discussing here. Jersey Central Power & Light Co. v. Federal Power Comm., 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258.

At the time the Act was passed petitioner's transmission system was so clearly interstate in character that it could operate most economically only by taking advantage of the savings afforded by an interstate electrical pool. The severing of connections, both contractual and otherwise, with that pool was not done as a normal business operation but as a last minute attempt to escape Federal jurisdiction. In order to accomplish that severance petitioner was compelled to load on to consumers unnecessary additional expense in furnishing electricity. The record contains evidence which establishes the improvident business character of converting the system to a relatively intrastate operation.[3] The attempt to make petitioner's operations appear intrastate was an artificial and costly gesture against sound business policy and against the interests of Connecticut consumers. And even after this gesture had been made there still remained some interstate connections which apparently could not be severed. The evidence that the use of petitioner's facilities on a purely intrastate basis was not a normal nor an efficient nor an economical use of that system supports the finding that it is in fact a system designed for interstate transmission of electricity. In severing its connections to avoid Federal jurisdiction petitioner restricted the availability of low cost electricity in Connecticut and raised a serious question whether such a restraint of interstate commerce for such a purpose was legal. But whether legal or not, it was an abnormal use of the transmission system, a use that would have amounted to bad business management except for the desire to escape Federal jurisdiction. These considerations are sufficient to convince us that the Commission in this case is not attempting to control a normally intrastate business through the accident of a trivial outside connection.

*Transmission of Energy to Fishers Island, New York.*

 The second connection with interstate transmission relied on by the government to support Federal jurisdiction is the fact that from the time of the passage of the Act until February, 1941, petitioner was supplying electric current to Fishers Island in New York. The current was sold to the Borough of Groton and resold by that municipality to Fishers Island. Petitioner stopped supplying the Borough with electricity for resale on the pretended ground that such resale was an ultra vires act. The actual reason was to escape Federal jurisdiction. Petitioner cannot escape Federal jurisdiction on the ground that the interstate movement of electric current to Fishers Island did not begin until the energy left the facilities of the petitioner at Groton. The current transmitted to Fishers Island amounted to only .2% of petitioner's business, but this fact would be significant only in a case where the Commission was attempting to get jurisdiction over a normally intrastate business because of some temporary and negligible outside sales. As we have shown, this is not such a case.

The finding of the Commission that the petitioner is a public utility is amply supported by the evidence. Its order will, therefore, be

Affirmed.

---

[3] "In the event that you wish to separate our systems, the matter can perfectly well wait until the time of the December peak has passed.

. "Our reason for the above decision is that we believe that the chance of our position being overruled by the courts is too remote to justify the loss of $100,000 a year and the greater plant investment to be shortly required under the present operating conditions."

(Excerpt from letter of S. Ferguson, Chairman of the Board of Directors, Connecticut Power Company, to J. Henry Roraback, President, Connecticut Light & Power Company, dated November 19, 1935.)