## CONNECTICUT LIGHT & POWER CO. *v.* FEDERAL POWER COMMISSION.

No. 189. Argued January 3, 1945.—Decided March 26, 1945.

516

*Messrs. Claude R. Branch* and *Gay H. Brown,* with whom *Messrs. Edward M. Day* and *Lawrence A. Howard* were on the brief, for petitioner.

*Assistant Attorney General Shea,* with whom *Solicitor General Fahy, Messrs. Joseph B. Goldman, Charles V. Shannon, Howard E. Wahrenbrock* and *Howell Purdue* were on the brief, for respondent.

*Mr. John E. Benton,* with whom *Mr. Frederick G. Hamley* was on the brief, for the Connecticut Public Utilities Commission et al., as *amici curiae,* urging reversal.

*Mr. Francis A. Pallotti,* Attorney General, filed a brief on behalf of the State of Connecticut, as *amicus curiae,* urging reversal.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The Federal Power Commission has asserted jurisdiction to regulate the accounting practices of the Connecticut Light and Power Company. The Federal Power Act as amended in 1935, 49 Stat. 838, 16 U. S. C. § 792 *et seq.,* declares a congressional policy concerning the business of transmitting and selling electric energy for ultimate distribution to the public, and states that regulation of "that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are

not subject to regulation by the States." § 201 (a), 49 Stat. 847, 16 U. S. C. § 824 (a).

The Company, incorporated by Connecticut, serving customers only in Connecticut and owning no utilities property outside of that state, is comprehensively regulated by the Connecticut Public Utilities Commission in accounting practices as in many other matters, and it challenges the jurisdiction of the Federal Power Commission.

The State of Connecticut, appearing *amicus curiae,* through its Attorney General avers that this assumption of jurisdiction by the Federal Commission "represents an unwarranted and illegal invasion of the powers of the State to regulate its local distributing company, which powers were clearly to be preserved to the State under the provisions of the Federal Power Act." The Connecticut Public Utilities Commission joins with the National Association of Railroad and Utilities Commissioners, also appearing as *amici curiae,* and they contend that the Federal Power Commission's order regulating accounting practices exceeds any authority given by the Federal Power Act and intrudes upon the field which that Act expressly reserved to local regulation.

The basic facts are not seriously in dispute. The Company for some time prior to August 26, 1935, the effective date of the Federal Power Act, operated as a member of the Connecticut Valley Power Exchange, an interstate power pool which interchanged energy among certain systems in New York, Massachusetts, and Connecticut. Had such operation continued, the Company would be subject to the Act and to the Commission's order. Two days before its effective date and frankly for the purpose of avoiding federal regulation the Company rearranged its operations with intent to cut every connection and discontinue every facility whose continued operation would render it subject to the Federal Power Commission's

control. The Commission conceded in its opinion and the Government admits here the Company's right to do so.[1] But the Commission said petitioner's effort was "only a gesture," for while it cut certain connections "it did not cut other interconnections over which interstate energy flowed." Of those facilities which the Commission held subjected the Company to the Power Act at the time it became effective, the Company has since divested itself of all but one, and on that one the Commission rests its present jurisdiction to control petitioner's accounting. But it also claims that its accounting orders were entitled to obedience up to the time of the abandonment of the other facilities and because of them.

The facilities on which jurisdiction is predicated are for two general types of operation, one being used in receipt of interstate power, the other for transmission of energy sold to a municipality which in turn sold some part of it for export from the state.

The only presently existing facilities said to confer jurisdiction are at Bristol. Here the petitioning company purchases energy from the Connecticut Power Company, which despite a confusing similarity of name is an entirely separate and unaffiliated concern. The petitioning company receives power at 66,000 volts from the lines of the Connecticut Power Company over a short tap line, owned by the Connecticut Power Company, which leads to petitioner's substation. There the energy is stepped down to 4,600 and 13,800 volts and transmitted thence over many circuits to consumers in and around Bristol. The substation includes all of the usual equipment, lightning arresters, disconnects, oil circuit breakers, busses, step-down

---

[1] Cf. *Re Twin State Gas & Electric Co.*, 33 P. U. R. (NS) 39, where the Commission approved a public utility's sale of certain facilities even though the sale might have been "a step in the direction that eventually results in the vendor company obtaining a status other than that of a public utility within the jurisdiction of this Commission."

transformers, and appurtenant structures of an outdoor substation; and in the substation building a synchronous condenser is owned and operated, as required by the supply contract, to maintain the power factor.

What is called the East Hampton connection, severed July 1, 1939, consisted of facilities by which the petitioner received energy from the Connecticut Power Company at 13,800 volts and transmitted it several miles to its Leesville substation where it was reduced to 4,600 volts and to other substations where it was reduced to 2,300 volts and supplied to customers. What is referred to as the Torrington-Winsted District connection, discontinued in June of 1941, was differently operated. Energy was purchased from the Torrington Electric Light Company, which in turn had purchased it from the Connecticut Power Company. Delivery was accepted by petitioner at the bus bar of the Torrington Company at low voltage, 2,300 volts, petitioner maintained a substation which stepped this voltage up to 27,600, at which it was transmitted about ten miles over its lines to a substation at Winsted where facilities were operated to lower the voltage to 4,600, whence it was put on distribution lines.

The Commission held in all three instances that such facilities of petitioner were "for the transmission of electric energy . . . as distinguished from local distribution thereof." It found that the energy received from the Connecticut Power Company and Torrington Company "regularly, frequently and for substantial periods of time included electric energy in substantial amounts transmitted from Massachusetts." Hence it concluded petitioner owned facilities for transmission of energy in interstate commerce and was a "public utility" under its jurisdiction by virtue of the Act.

The other type of operation on which it predicated jurisdiction was terminated in February 1941. It consisted of sale of energy at wholesale to the Borough of

Groton, which operated a municipal distribution plant. The Borough, with knowledge of the Company, resold a portion of this energy to a corporation which transmitted it to Fishers Island, a small island off Connecticut shore but territory of New York. There it was distributed to that small community at retail. When the Groton contract expired in 1940 petitioner refused to renew it unless the Borough discontinued sales of energy destined for Fishers Island. This change was required by the Company avowedly to eliminate flow of its energy to New York and thus to remove one of the grounds on which the Commission has asserted jurisdiction.

The Commission held that from the effective date of the Act to February 28, 1941, facilities owned by the Company were used to convey electric energy to the Borough of Groton "for the transmission and sale at wholesale of electric energy in interstate commerce" and that such facilities were for transmission of such energy "as distinguished from local distribution thereof." Hence the Company was held to have been a public utility during the period of such operation and subject for that period to the jurisdiction of the Commission.

It is not denied, although the Commission's findings and opinion make no mention of the fact and appear to have given it no weight, that the predominant characteristic of the company's over-all operation is that of a local and intrastate service. It serves one hundred seven towns, cities, and boroughs of Connecticut with a total population of about 660,000 and in addition supplies substantially all the power used by local companies which serve communities of Connecticut having a population of 130,000. It owns no lines crossing the Connecticut boundary and does not connect with any other company at the boundary. It has no business other than Connecticut service for which it needs any facilities whatever, and if local distribution service were terminated, no remaining pur-

pose or use of any kind is suggested for the facilities in question. Its purchases and sales, its receipts and deliveries of power, are all within the state. Its rates and its fiscal and accounting affairs are fully and so far as appears effectively regulated by the State of Connecticut.

The Federal Power Commission on January 7, 1941 issued its order requiring petitioner to show cause why it should not be held to be a "public utility" subject to the Act and why it should not reclassify and keep its accounts according to the Federal Commission's uniform system. On May 15, 1942 it issued findings and decision. Rehearing was denied. The Company then applied for the review by the Court of Appeals of the District of Columbia to which the statute entitles it. § 313 (b) of the Act, 49 Stat. 860.

The Court of Appeals sustained the orders. 141 F. 2d 14. It held that "The Federal Power Act obviously intends to confer Federal jurisdiction upon electric distribution systems which normally would operate as interstate businesses." It construed the "but" clause of the Act, which we shall later consider, as "intended to make it clear that this [the Commission's] jurisdiction extends even to local facilities where the Act provides for their regulation, as it does in the case of accounting practices." The Court concluded that "Therefore, whether or not the facilities by which petitioner distributes energy from Massachusetts should be classified as 'local' is not relevant to this case. The sole test of jurisdiction of the Commission over accounts is whether these facilities, 'local' or otherwise, are used for the transmission of electric energy from a point in one state to a point in another." We granted certiorari. 323 U. S. 687.

The first question is whether the reviewing court acted under a misapprehension as to the meaning of the statute.

The jurisdictional and regulatory provisions of the Federal Power Act apply only to "public utilities," and the

Act provides that by "public utilities" it "means any person who owns or operates facilities subject to the jurisdiction of the Commission." § 201 (e), 49 Stat. 848. These facilities are carefully defined. "The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part and the Part next following, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter." § 201 (b). Transmission and sale as used in this provision are further defined to mean respectively "transmission of electric energy in interstate commerce" and "sale of electric energy at wholesale in interstate commerce." And the Act goes on to say: "electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof" and that sale of electric energy at wholesale means "a sale of electric energy to any person for resale." §§ 201 (c), (d). Of course as preamble to all of these provisions stands the policy declaration that Federal regulation "of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." § 201 (a).

Can it be said in that state of the statute that whether facilities are local is not relevant to this case? The Court of Appeals in returning an affirmative answer to this question noted that "There is a superficial inconsistency" between its position and the last quoted provision of the Act. But it said that we, in *Jersey Central Power & Light Co.* v. *Federal Power Commission,* 319 U. S. 61, held this "lim-

itation" "not to apply to the sections of the Act which specifically give the Federal Power Commission jurisdiction over matters of financial arrangement, such as the accounting section which we are discussing here." This misapprehends our holding in the *Jersey Central* case. The line did not cross state borders and since it was wholly within one state, it was contended that the line was used for intrastate transmission and that the Act did not apply although the line was used to transmit power in its course of exportation from the State. We denied this contention and said, "It is impossible for us to conclude that this definition means less than it says and applies only to the energy at the instant it crosses the state line and so only to the facilities which cross the line and only to the company which owns the facilities which cross the line. The purpose of this act was primarily to regulate the rates and charges of the interstate energy. If intervening companies might purchase from producers in the state of production, free of federal control, cost would be fixed prior to the incidence of federal regulation and federal rate control would be substantially impaired, if not rendered futile." 319 U. S. at 71–72. We held that the "primary purpose" of the 1935 amendments to the Power Act was to give the Power Commission control of sales of energy across state lines which had been held to be beyond the control of the state of export in *Public Utilities Commission* v. *Attleboro Steam & Electric Co.*, 273 U. S. 83. Here, however, the federal authority to fix the sale price of the energy coming from Massachusetts in interstate commerce attaches and presumably has been or at least may be exercised pursuant to the *Jersey Central* holding before the energy reaches this company. What petitioner does or fails to do is only after the incidence of federal regulation and can in no way frustrate it.

In the *Jersey Central* case on consideration of its facts we said, "We conclude, therefore, that Jersey Central is

a public utility under this act." 319 U. S. at 73. Such a finding made the provisions of the Act apply to it. But the Company contended, notwithstanding its status as a public utility, that it was carried out of that particular federal regulation by the fact that the state regulated its security issues. We held that state regulation does not operate to exempt from the security provisions a company otherwise subject to the Commission's jurisdiction but that "The sounder conclusion, it seems to us, is that the limitation is directed at generation, transmission and sale rather than the corporate financial arrangements of the utilities engaged in such production and distribution." *Id.* at 74–75. In other words, the policy admonition is to be heeded in determining whether particular facilities make their owner a "public utility" rather than in exempting from specific regulatory provisions a company found to be a public utility. The *Jersey Central* case does not read the policy declaration out of the Act as the court below assumed it to do.

Legislative history is illuminating as to the congressional purpose in putting these provisions into the Act. As frequently is the case, this original bill was drafted by the counsel and aides of the agency concerned.[2] In its support Commissioner Seavey of the Federal Power Commission said to the House Committee, "The new title II of the act is designed to secure coordination on a regional scale of the Nation's power resources and to fill the gap in the present State regulation of electric utilities. It is conceived entirely as a supplement to, and not a substitute for, State regulation."[3] Progress of the bill through various stages shows constant purpose to protect rather than to supervise authority of the states. In reporting a

---

[2] Hearings, Senate Committee on Interstate Commerce on S. 1725, 74th Cong., 1st Sess., 223.

[3] Hearings on H. R. 5423, House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess., 384.

revised bill to the Senate the Committee on Interstate Commerce said, "Subsection (a) . . . declares the policy of Congress to extend that regulation to those matters which cannot be regulated by the States and to assist the States in the exercise of their regulatory powers, but not to impair or diminish the powers of any State commission." [4] The Report of the House Committee on Interstate and Foreign Commerce in presenting the amended bill called attention to *Public Utilities Commission* v. *Attleboro Steam & Electric Co.*, 273 U. S. 83, holding that rates charged in interstate wholesale transactions may not be regulated constitutionally by the states, and expressed the purpose to give federal jurisdiction to regulate rates of wholesale transactions, but not to give jurisdiction over local rates. It said:

"The bill takes no authority from State commissions and contains provisions authorizing the Federal Commission to aid the State commissions in their efforts to ascertain and fix reasonable charges. . . . The new parts are so drawn as to be a complement to and in no sense a usurpation of State regulatory authority and contain throughout directions to the Federal Power Commission to receive and consider the views of State commissions. Probably, no bill in recent years has so recognized the responsibilities of State regulatory commissions as does title II of this bill."

.         .         .         . .         .

"Subsection (b) confers jurisdiction upon the Commission over the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce, but does not apply to any other sale of electric energy or deprive a State of any lawful authority now exercised over the exportation of hydroelectric energy transmitted out of the State. As

---

[4] Sen. Rep. No. 621, 74th Cong., 1st Sess.

in the Senate bill no jurisdiction is given over local distribution of electric energy, and the authority of States to fix local rates is not disturbed even in those cases where the energy is brought in from another State." [5]

If we consider the professions of the sponsors of this bill to have been in good faith, where are we to find them written into the Act?

The policy declaration that federal regulation is "to extend only to those matters which are not subject to regulation by the States" is one of great generality. It cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly expressed purpose. But such a declaration is relevant and entitled to respect as a guide in resolving any ambiguity or indefiniteness in the specific provisions which purport to carry out its intent. It cannot be wholly ignored.

The declared purpose might also be looked for in specific denials of power to the Commission, such as that found in § 204 (f), which provides that its controls, relating to issuance of securities, shall not extend to a public utility operating in a state under the laws of which its securities are regulated by a state commission. But such exemptions from particular regulations apply only to companies found in general to be subject to federal regulation and do not protect the state's general control over its local utilities.

The assurance which the sponsors of this legislation expressed as to protection of the general jurisdiction of a state over electric utilities of this character either is not given effect by this Act at all, or it is to be found in the words of § 201 (b), "but shall not have jurisdiction, except as specifically provided in this Part and the Part next following, . . . over facilities used in local distribution . . ." The court below, following a statement in

---

[5] H. R. Rep. No. 1318, 74th Cong., 1st Sess., 7, 8, 27.

*Hartford Electric Light Co.* v. *Federal Power Commission,* 131 F. 2d 953 (C. C. A. 2d, 1942), held that this "but" clause "is intended to make it clear that this jurisdiction extends even to local facilities where the Act provides for their regulation, as it does in the case of accounting practices." This seems to get the cart before the horse, for whether the Act provides for such regulation depends on whether the facilities are under the jurisdiction of the Commission; the Commission's jurisdiction does not depend on some independent application of the regulatory provisions. But the cited decision, pointing out that one of the several types of facilities mentioned as exempt in the "but" clause, i. e., those "used *only* for transmission in intrastate commerce," could not possibly be used for interstate transmission, rejected the whole provision to avoid a "foolish interpretation." It concluded, "The 'but' clause then shows up not as one reducing jurisdiction but as a negatively worded confirmation of the Commission's jurisdiction, in certain circumstances, over the facilities mentioned in the 'but' clause." [6] The Commission takes much the same position here.

It is hard for us to believe that Congress meant us to read "shall have jurisdiction" where it had carefully writ-

---

[6] The statement was not decisive of the result, which rested on an alternative ground; and the court did recognize need for the further step of finding that the generating facilities were used as facilities for interstate wholesale sales, and therefore were within § 201 (b). The court below failed expressly to find existence of jurisdictional facilities under § 201 (b). The quoted statement reads in full:

"Moreover, among the facilities described in the 'but' clause of § 201 (b), are those used 'only for the transmission . . . in intrastate commerce'; as such facilities could not possibly be among those used for interstate transmission or interstate wholesale sales, the 'but' clause becomes foolish if interpreted as carving out of the authority granted in the earlier part of the same sentence the facilities described in the 'but' clause. Such a foolish interpretation is avoided by giving effect to a phrase in the 'but' clause, i. e., 'except as specifically provided

ten "but shall not have jurisdiction." The command "thou shalt not" is usually rendered as to forbid and we think here it was employed without subtlety or contortion and in its usual sense. If otherwise in doubt this provision should be read in harmony with the policy provision. So read, its terms seem plainly to state circumstances under which the Commission shall not have jurisdiction. As such it is the provision which loomed importantly in the minds and speech of its sponsors, perhaps was necessary to get the bill passed, and is one which the Commission must observe and the courts must enforce.

This bill came before Congress as prepared by the staff of the Commission, couched largely in the technical language of the electric art. Federal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental, test. Technology of the business is such that if any part of a supply of electric energy comes from outside of a state it is, or may be, present in every connected distribution facility. Every facility from generator to the appliance for consumption may thus be called one for transmitting such interstate power. By this test the cord from a light plug to a toaster on the breakfast table is a facility for transmission of interstate energy if any part of the load is generated without the state. It has never been questioned that technologically generation, transmission, distribution and consumption are so fused and interdependent that the

in this Part or the Part next following [sections 824–825r of this title].' The 'but' clause then shows up not as one reducing jurisdiction but as a negatively worded confirmation of the Commission's jurisdiction, in certain circumstances, over the facilities mentioned in the 'but' clause. In other words, the 'but' clause is to be construed as if it read: 'Wherever it is so specifically provided in Parts II and III, the Commission shall have jurisdiction over the facilities used for generation, for local distribution, for intrastate transmission, etc.' " *Hartford Electric Light Co.* v. *Federal Power Commission*, 131 F. 2d 953, 962.

whole enterprise is within the reach of the commerce power of Congress, either on the basis that it is, or that it affects, interstate commerce, if at any point it crosses a state line. Such a broad and undivided base for jurisdiction of the Power Commission would be quite unobjectionable and perhaps highly salutary if the United States were a unitary government and the only conflicting interests to be considered were those of the regulated company.

But state lines and boundaries cut across and subdivide what scientifically or economically viewed may be a single enterprise. Congress is acutely aware of the existence and vitality of these state governments. It sometimes is moved to respect state rights and local institutions even when some degree of efficiency of a federal plan is thereby sacrificed. Congress may think it expedient to avoid clashes between state and federal officials in administering an act such as we have here. Conflicts which lead state officials to stand shoulder to shoulder with private corporations making common cause of resistance to federal authority may be thought to be prejudicial to the ends sought by an act and regulation more likely to be successful, even though more limited, if it has local support. Congress may think complete centralization of control of the electric industry likely to overtax administrative capacity of a federal commission. It may, too, think it wise to keep the hand of state regulatory bodies in this business, for the "insulated chambers of the states" are still laboratories where many lessons in regulation may be learned by trial and error on a small scale without involving a whole national industry in every experiment.

But whatever reason or combination of reasons led Congress to put the provision in the Act, we think it meant what it said by the words "but shall not have jurisdiction, except as specifically provided in this Part or the Part next following . . . over facilities used in local distribu-

tion." Congress by these terms plainly was trying to reconcile the claims of federal and of local authorities and to apportion federal and state jurisdiction over the industry. To define the scope of state controls, Congress employed terms of limitation perhaps less scientific, less precise, less definite than the terms of the grant of federal power. The expression "facilities used in local distribution" is one of relative generality. But as used in this Act it is not a meaningless generality in the light of our history and the structure of our government. We hold the phrase to be a limitation on jurisdiction and a legal standard that must be given effect in this case in addition to the technological transmission test.

Nor do we think the exemption of "facilities used in local distribution" exempts only those which do not carry any trace of out-of-state energy. Congress has said without qualification that the Commission shall not, unless specifically authorized elsewhere in the Act, have jurisdiction "over facilities used in local distribution." To construe this as meaning that, even if local, facilities come under jurisdiction of the Federal Commission because power from out of state, however trifling, comes into the system, would nullify the exemption and as a practical matter would transfer to federal jurisdiction the regulation of many local companies that we think Congress intended to leave in state control. It does not seem important whether out-of-state energy gets into local distribution facilities. They may carry no energy except extra-state energy and still be exempt under the Act. The test is whether they are local distribution facilities. There is no specific provision for federal jurisdiction over accounting except as to "public utilities." The order must stand or fall on whether this company owned facilities that were used in transmission of interstate power and which were not facilities used in local distribution.

Since the Court of Appeals considered irrelevant the jurisdictional test which we find to be imposed by Congress, the inquiry on review has not proceeded under a correct rule of law and it follows that the judgment of the Court of Appeals must be reversed.

Whether the Commission's decision was reached under the same misapprehension of the law of its jurisdiction is not made so clear from its findings or opinion. Of course under the Act "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." § 313 (b). The Commission has found that each of the facilities in question is "used for the transmission of electric energy purchased as aforesaid from the Connecticut Power Company, as distinguished from local distribution thereof." It has not, however, made an explicit finding that these facilities are not used in local distribution; and we are in doubt whether by application of the statute as herein construed it could have done so. We have said, and it is applicable to this case, that "Where a federal agency is authorized to invoke an overriding federal power except in certain prescribed situations and then to leave the problem to traditional state control, the existence of federal authority to act should appear affirmatively and not rest on inference alone." *Yonkers* v. *United States*, 320 U. S. 685, 692; *Florida* v. *United States*, 282 U. S. 194, 211–12; cf. *Palmer* v. *Massachusetts*, 308 U. S. 79, 84; *Federal Trade Commission* v. *Bunte Bros.*, 312 U. S. 349, 351. Nothing except explicit findings excluding the grounds of state control gives assurance that the bounds of federal jurisdiction have been accurately understood and fully respected, and that state power has been considerately and deliberately overlapped.

The findings and opinion of the Commission leave us in doubt, to say the least, as to whether what we consider limitations on the jurisdiction of the Commission were so considered by it. The only specific reference to the sub-

ject is the statement that "Respondent's contentions that it is subject to regulation by the Public Utilities Commission of the State of Connecticut and therefore not subject to the regulation provided by the Federal Power Act must be rejected," citing *Northwestern Electric Co.* v. *Federal Power Commission,* 125 F. 2d 882, and *In the Matter of Hartford Electric Light Co.,* 2 F. P. C. 502, aff'd, 131 F. 2d 953. In both of those cases factual differences in reference to the status of the company as a public utility were involved, and we agree with the Commission that once a company is properly found to be a "public utility" under the Act the fact that a local commission may also have regulatory power does not preclude exercise of the Commission's functions. Cf. *Northwestern Electric Co.* v. *Federal Power Commission,* 321 U. S. 119. But such a rejection of state control as grounds of exemption must be preceded by the finding, giving due weight to the policy declaration in doubtful cases, that the company in question is a "public utility" by reason of ownership of facilities not used in local distribution.

In determining this the Commission announced and applied a rule which appears to be one of law as to interstate transmission: "Such transmission, in our opinion, extends from the generator, where generation is complete [citing *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165, 181] to the point where the function of conveyance in bulk over a distance, which is the essential characteristic of 'transmission,' is completed and the process of subdividing the energy to serve ultimate consumers, which is the characteristic of 'local distribution,' is begun [citing *Southern Gas Corp.* v. *Alabama,* 301 U. S. 148, 155; and *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, 471]."

The *Southern* and *East Ohio* cases both involved natural gas transportation into a state and sales of gas at retail therein. Each was a tax case in which the state

asserted that the sales within the state constituted an intrastate business which in one case would support a state levy of an annual franchise tax based on the actual amount of capital employed in the state; and in the other, an excise tax based on gross receipts from the business within the state. The companies each contended that sales made to consumers within the state were still within interstate commerce and hence there was no state jurisdiction to tax. In neither case was this Court required to determine the exact point at which interstate commerce ceased and intrastate commenced. It was required to find only some "doing of business" within the state in order to sustain the constitutionality of the statutes involved. In both cases it upheld the power of the state to tax and in both held that the distribution at low pressure was a local business for taxation purposes as distinguished from transmission in interstate commerce. But a holding that distributing gas at low pressure to consumers is a local business is not a holding that the process of reducing it from high to low pressure is not also part of such local business. In so far as the Commission found in these cases a rule of law which excluded from the business of local distribution the process of reducing energy from high to low voltage in subdividing it to serve ultimate consumers, the Commission has misread the decisions of this Court. No such rule of law has been laid down.

But for such an erroneous view of the law established by our decisions it seems doubtful if the Commission would have reached the conclusion that it did upon this record. Nor is it clear that if it were reached it would be supported by substantial evidence. Expert testimony received by the Commission on the subject from the Commission's own experts seems to have been predicated upon the Commission's understanding of the law. It is not for us to make an original appraisal of the facts. We do not therefore undertake to decide as an original matter

whether the facilities in question are or are not facilities which can subject the Company to the Act.

Nor do we undertake to pass upon the contention of the Government that even if the present facilities do not constitute a sufficient basis for federal jurisdiction the operation of other facilities since abandoned subjects the Company to the accounting order of the Commission for the period of January 1, 1937, when it became effective, until June 1, 1941 or some other date, depending on the facility found to be the basis of jurisdiction. The Company contends that to make it install an expensive system of accounting for a period that was short and has already expired would be a mere waste of time and money and would be of no practical benefit. The Commission contends that the accounting requirements and information would tend to discourage further write-ups and inflation of accounts and would amount to "regulation by the informatory process." It contends that this company has been guilty of accounting abuses in the nature of write-ups and the creation of fictitious surpluses which would be eliminated or at least discouraged by an application of its uniform system of accounts. The Company denies that such abuses exist. It is not, however, contended that Congress has conferred any jurisdiction upon the Commission to reach accounting abuses when and if they exist except as to companies which own facilities subject to the jurisdiction of the Commission. In other companies the correction of these abuses, if they exist, is left to the state government, which has this company completely within its power and whose constituents are the sufferers by any abuses that may exist. We will not undertake to make an original finding as to jurisdiction for a period, any more than as to jurisdiction at the present time.

Another contention made by the Company may be shortly disposed of. It is contended that the volume of energy passing over certain of these facilities is insignifi-

cant in proportion to the total. Only about one-fifth of one per cent of all the energy received and generated by the Company throughout the State of Connecticut was transmitted out of the state during the time of the connection of Fishers Island with the Borough of Groton. Congress appears to have left to the Commission's sound administrative discretion to determine whether or not to assert its authority in such situations. Congress annually receives a report of the Commission's work and appropriates the funds for its continuance. If it thinks the Commission is over-extending its attention to trivial situations it has ready means of control in its hands. The wisdom of its work is not our concern, but only its legal justification. We do not find that Congress has conditioned the jurisdiction of the Commission upon any particular volume or proportion of interstate energy involved, and we do not think it would be appropriate to supply such a jurisdictional limitation by construction.

For the reasons stated, the judgment of the Court of Appeals is reversed with instructions to remand the cause to the Federal Power Commission for further proceedings consistent with this opinion.

*Reversed.*

MR. JUSTICE RUTLEDGE concurs in the result.

MR. JUSTICE MURPHY, dissenting.

The findings and opinion of the Federal Power Commission in this case make clear that they are substantially and reasonably rooted in fact and law and that proper respect has been shown for jurisdictional limitations. Remand of the case to the Commission for further consideration thus can only serve to produce needless delay and to force the Commission to make certain minor and unnecessary changes in its written opinion. Cf. dissenting opinion in *Securities & Exchange Commission* v. *Chenery Corp.,* 318 U. S. 80, 95.

The basic jurisdictional fact necessary to sustain the imposition on petitioner of the Commission's accounting standards is that petitioner be a public utility within the meaning of the Federal Power Act. In the setting of this case petitioner must thus be found to own or operate facilities for the "transmission of electric energy in interstate commerce." § 201 (b). Nowhere in the Act has Congress defined "transmission" or "facilities" other than to say in § 201 (c) that "electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof." The Commission therefore has the duty in the first instance of interpreting and applying these terms to the factual situation confronting it. A court's function in reviewing this jurisdictional determination is necessarily limited to ascertaining whether that determination has warrant in the record and a reasonable basis in law, giving due weight to the fact that the Commission is an expert body designated by Congress and specially equipped to grapple with the highly technical problems arising in this field. *Labor Board* v. *Hearst Publications,* 322 U. S. 111, 130, 131.

The Commission here has found that petitioner owns and operates an electric utility system in the State of Connecticut. It is undisputed that electric energy generated in Massachusetts is transmitted over the wires of other companies to petitioner's facilities at Bristol, Connecticut. In order to transmit power economically for such a long distance, it is necessary to raise the voltage and reduce the current in Massachusetts as the energy starts its interstate journey. But the high voltage needed for transit purposes cannot be utilized by consumers. It therefore is necessary to employ apparatus at the receiving end of the interstate transmission to lower the voltage. Petitioner accordingly maintains step-down transformers and substation facilities at Bristol for that purpose. After the voltage is lowered, the energy is subdivided and dis-

tributed over petitioner's wires to consumers in and around Bristol.

The Commission concluded that the functions of the Bristol step-down transformers and substation facilities constitute transmission of energy in interstate commerce since it felt that, in its opinion, such transmission "extends from the generator, where generation is complete, to the point where the function of conveyance in bulk over a distance, which is the essential characteristic of 'transmission,' is completed and the process of subdividing the energy to serve ultimate consumers, which is the characteristic of 'local distribution,' is begun." In other words, the Commission viewed the interstate transmission as complete only after the energy is converted back into a form suitable for local distribution and use and the facilities used for such conversion purposes are necessarily facilities for interstate transmission.

The jurisdictional determination of the Commission must therefore stand or fall upon the validity of its analysis of when long-distance transmission of electrical energy across state lines is at an end. Only if we can point to an absence of any substantial evidence to support the Commission's view or if we can find legal or statutory principles compelling the opposite view can we justifiably say that the Commission had no jurisdiction in this case or that remand should be made to the Commission for further proceedings. But the Commission's view cannot be undermined on either basis and it should therefore be affirmed.

Certainly there is ample testimony in this case by engineers to the effect that the Bristol substation equipment constitutes "facilities for transmission of electric energy in interstate commerce," as distinguished from "facilities used in local distribution." And the very fact that the Commission, with all its accumulated wisdom and experience, is of the opinion that interstate transmission ceases

only after the transmitted energy has been converted into a form suitable for local distribution and use is not without weight and significance.

From a legal standpoint, the Commission made no plain error. Clearly no opinion in this Court has purported to decide at what precise point interstate transmission of electrical energy ends and local distribution commences. This seems to be a novel point insofar as legal precedent is concerned. The Commission's conclusion in this respect hardly seems so unreasonable and unsound as to require us to hold, as a matter of law, that interstate transmission ends just before the voltage is decreased. And this Court does not pretend so to hold in this case.

The Court criticizes the Commission and remands the case to it, however, mainly because it cited *Southern Gas Corp.* v. *Alabama,* 301 U. S. 148, 155, and *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, 471, in a footnote in support of its proposition that interstate transmission ends only after the energy is converted back into a form suitable for local distribution. It is said that the Commission erroneously assumed that those cases set forth a rule of law which excluded the process of reducing energy from high to low voltage in subdividing it to serve ultimate consumers from the business of local distribution. But even assuming that these two cases do not enunciate such a rule and do not directly support the Commission's proposition, it does not follow that the Commission committed reversible error by citing them in a footnote. The Commission's proposition was grounded not on these two cases but upon the testimony in the record and its own knowledge and experience pertaining to electrical transmission. This is plainly revealed by the use of the phrase "in our opinion" in the sentence setting forth the Commission's distinction between interstate transmission and local distribution. The slight reference to the *Southern Gas* and *East Ohio* cases was at most for purposes of

540

analogy and cannot serve to impair the true underlying basis of the Commission's proposition. Presumably all the Commission need do on remand in this respect is to remove the footnote reference to these cases—a fact that makes obvious the proposition that more than an irrelevant or even erroneous citation of a case should be required before we are justified in reversing an administrative determination and sending it back for further consideration.

The Court also deals at great length with the policy declaration in § 201 (a) of the Act that federal regulation is "to extend only to those matters which are not subject to regulation by the States" and with the "but" clause in § 201 (b), which states that the Commission shall not have jurisdiction, except as specially provided, over certain facilities, including those used in local distribution. But neither of these provisions is controlling in this case where the Commission has made a clear and supportable finding that petitioner is a public utility within the meaning of the Act and where the only federal regulation sought to be imposed is the accounting requirements of § 301 (a).

It may be conceded that this Court in *Jersey Central Co.* v. *Federal Power Commission,* 319 U. S. 61, did not read out of the Act the policy declaration in § 201 (a). But it did make clear that the declaration, which speaks solely in terms of "regulation," was directed solely at proposed federal regulation of the generation, transmission and sale of electric energy rather than at proposed federal regulation of the corporate financial arrangements of utilities, such as their accounting methods. 319 U. S. at 74, 75. Congress did not intend, in other words, to intrude upon state regulation of generation, transmission and sale of energy but it did intend to impose financial regulations on public utilities engaged in interstate transmission of energy even though states might also impose financial

regulations. This means, under the facts of this case, that interstate transmission of energy is a proper test of whether federal accounting standards may be imposed. What sort of transmission may be a proper subject of federal regulation in and of itself if the State of Connecticut already regulates the transmission facilities is not in issue. The Commission clearly did not misconceive the meaning of this policy declaration and, in light of this Court's opinion, it apparently need do no more than spell out its recognition of the scope and present inapplicability of the declaration.

Nor did the Commission do violence to the "but" clause of § 201 (b). Here the Commission, following the rule stated in the *Jersey Central* case, 319 U. S. at 73, that "the determinative fact is the ownership of facilities used in transmission," has found that petitioner is a public utility since it owns and operates facilities used in interstate transmission of energy. The Commission thus has jurisdiction over petitioner for accounting purposes. The denial of jurisdiction in the "but" clause where facilities are used for transmission of energy in local commerce has no relevance in this case, an obvious fact which the Commission apparently now must make explicit on remand.

The Commission is dealing here with a difficult marginal case. The precise dividing line between interstate transmission and local distribution can only be drawn by those familiar with the engineering and electrical problems involved. The problem in this case, moreover, is a relatively unique one. An informal survey by the Commission has shown that out of a total of about 1,000 privately owned electric utilities there are only 12 which own or operate step-down substation facilities for taking out-of-state energy and which would not otherwise be public utilities under the Act. The problem is thus one peculiarly within the competence of the Commission, which has shown no desire to use the principle it has enunciated in

542

this case and could not use it as a vehicle for assuming unjustified jurisdiction over the facilities of all the local distributing companies in the nation. It has given proper respect to the dictates of Congress relative to state regulation. We should therefore affirm its action in this case without burdening it with requirements of artistic refinement and of negations of the applicability of irrelevant statutory provisions.

MR. JUSTICE BLACK and MR. JUSTICE REED join in this dissent.