**CITY OF PARIS, KENTUCKY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

**Kentucky Utilities Company, Intervenor.**

No. 21375.

United States Court of Appeals
District of Columbia Circuit.

Argued May 24, 1968.

Decided July 3, 1968.

Mr. Philip P. Ardery, Lousville, Ky., for petitioner.

Mr. Israel Convisser, Attorney, Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel, and Peter H. Schiff, Solicitor, Federal Power Commission, were on the brief, for respondent.

Mr. Malcolm Y. Marshall, Louisville, Ky., with whom Mr. Squire R. Ogden, Louisville, Ky., was on the brief, for intervenor. Mr. Thomas M. Debevoise, Washington, D. C., also entered an appearance for intervenor.

Before FAHY, Senior Circuit Judge, and WRIGHT and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

On October 7, 1965, the City of Paris, Kentucky, filed a complaint with the Federal Power Commission against the Kentucky Utilities Company, an investor-owned public utility, asking that the Commission order Kentucky Utilities to interconnect its electric transmission facilities with those of Paris and to transmit over its lines an exchange of energy between Paris and the East Kentucky Rural Electric Cooperative Corporation. Annexed to the complaint was a contract between Paris and East Kentucky for the sale and exchange of energy between them.

The City of Paris owns and operates an electric generation and distribution system which now serves approximately 75 per cent of its residents. The firm capacity of Paris' system having become inadequate to meet increased demand, Paris entered negotiations with Kentucky Utilities seeking an additional source of supply of electric energy. Kentucky Utilities now serves that part of Paris and its environs not served by the municipal system and operates two transmission lines, 69 kv and 33 kv, through the city. Its 69 kv line is only about 1500 feet from Paris' generating system. Paris' negotiations with Kentucky Utilities proved unsuccessful. Paris then turned to East Kentucky as an alternative source of additional energy and negotiated the contract with East Kentucky for the sale and exchange of electric energy which is the subject of these proceedings.

East Kentucky is a Rural Electrification Administration financed generating and transmitting cooperative which operates two steam generating plants to supply its member cooperatives throughout Kentucky. Its transmission lines interconnect with those of Kentucky Utilities at some 19 different points where the two systems exchange energy with one another. But the nearest facilities of East Kentucky are 8.7 miles from Paris, and it was to obviate the need to construct a 69 kv transmission line for this distance that Paris requested in its complaint that the Commission order Kentucky Utilities to interconnect its electric transmission facilities with those of Paris to facilitate its interchange with East Kentucky.

In its answer to the complaint Kentucky Utilities opposed Paris' request and offered instead to sell energy to, and exchange energy with, Paris at a cost to Paris that would be less than the cost of securing energy from East Kentucky. This proposal necessarily contemplated the requested connection between Kentucky Utilities and Paris. In rejecting the Paris complaint, the Commission ordered Kentucky Utilities to provide the connection, but only for the purpose of supplying its own energy to Paris.

In denying the relief requested by Paris, the Commission, citing its earlier ruling in Dairyland Power Cooperative, 37 F.P.C. 12 (1967), held that it had no jurisdiction over the activities of either municipalities (Paris) or REA-financed cooperatives (East Kentucky). Therefore, the Commission felt, it did "not have to decide whether it can order under section 202(b) a public utility to transmit [the] power [of another utility] for the benefit of third parties since it is clear that the Commission cannot compel a private utility to transmit the power of government instrumentalities under Part II of the FPA." Since, in its judgment, both Paris and East Kentucky were Section 201(f) (16 U.S.C. § 824(f) (1964 ed.)) government instrumentalities, the Commission held that it could not grant the relief requested by Paris.

Section 202(b) of the Power Act, 16 U.S.C. § 824a(b) (1964 ed.), provides that "[w]henever the Commission, upon application of any * * * person engaged in the transmission or sale of electric energy, and after notice to * * [the] public utility affected * * *, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, *to sell energy to or exchange energy with* such persons * * *." (Emphasis added.) It is clear that under this section the Commission can order a public utility to sell *its* energy to, or exchange *its* energy with, any *person* engaged in transmission or sale of electric energy.[1] But the issue of whether a privately owned public utility can, under this section, be ordered to transmit the power of *another* for the benefit of third parties— that is, to "wheel" for another utility— has never been resolved by the Commission and was avoided by it in the proceedings below. For even though Section 202(b) itself does not distinguish between publicly owned and privately owned utilities, the legislative history of the Power Act convinced the Commission that, even if it can sometimes order a privately owned utility to wheel, it can never order such a utility to transmit the

---

1. It was under this section, § 202(b), that the Commission ruled it was empowered to direct an interconnection between Kentucky Utilities and Paris and to order Kentucky Utilities to provide service directly to Paris. Finding the record adequate in all respects, the Commission examined Kentucky Utilities' proposal for selling its energy to Paris and found it acceptable. Accordingly, it ordered Kentucky Utilities to interconnect with Paris and to supply its own energy to Paris under the rate schedule which Kentucky Utilities had offered.

power of a Section 201(f) government instrumentality.[2]

The Commission's decision in *Dairyland,* on which it relied here for its holding that East Kentucky, as an REA-financed cooperative, was a Section 201 (f) government instrumentality, rested on two alternative grounds. In *Dairyland* the Commission held first that Congress simply never intended these cooperatives to be within its general jurisdiction because they are not encompassed in the term "public utilities" as used in Parts II and III of the Power Act. To buttress its holding, and of particular importance here, the Commission also based its denial of jurisdiction on the Section 201(f) exemption for government instrumentalities which it held included cooperatives.

The Commission's *Dairyland* decision was never directly subjected to judicial scrutiny. However, in Salt River Project Agricultural Improvement & Power District v. F.P.C., 129 U.S.App.D.C. 117, 391 F.2d 470 (1968), this court had occasion to review a Commission decision raising precisely the same issues. In *Salt River* the Commission, relying on *Dairyland* which it had just decided, held that REA-financed Colorado-Ute Electric Association (a cooperative) was not subject to its jurisdiction. We affirmed that decision on the ground that Colorado-Ute was not a public utility within the meaning of Parts II and III of the Federal Power Act. We carefully avoided reaching the question whether REA-financed cooperatives were also exempt as government instrumentalities under Section 201(f).

Now that question must be faced. For the Commission's decision here rested at least in part on its determination that East Kentucky is a government instrumentality. It was because it considered East Kentucky to be a Section 201(f) instrumentality that the Commission never reached the question whether the proposed interchange between Paris and East Kentucky was in the public interest, and it avoided the major issue of whether it can ever order an objecting privately owned utility to transmit the power of another utility for the benefit of third persons. Since we hold that REA-financed cooperatives as presently administered and financed are not government instrumentalities under Section 201(f), we remand to the Commission so it can decide in the first instance whether it can order Kentucky Utilities to wheel for another utility and, if it can, whether it would be in the public interest to order Kentucky Utilities to do so in this case.[3]

In *Salt River* we pointed out that Congress, in enacting the Federal Power Act in 1935, was not concerned with REA-financed cooperatives. In the first place, the Rural Electrification Administration had been created by executive order just a few months before and, prior to the Power Act, had made only a few very small loans. The agency was not permanently established until Congress enacted the Rural Electrification Act in 1936. In the second place, the abuses in the power industry at which the 1935 Power Act was primarily aimed were not associated with the cooperative structure where ownership and control are vested in the consumer-owners. It was for these reasons that we felt Congress did not intend to include REA-financed cooperatives within the purview of the term

2. Paris seems almost to concede that the legislative history proves the Commission's view that public utilities are not to be compelled to transmit energy generated by a government instrumentality. It makes the technical argument, however, that it is not seeking point-to-point deliveries over the lines of a privately owned utility, but only "simple displacement" of electrical energy. If the Commission is correct in its reading of the legislative history, then it clearly is correct in treating point-to-point deliveries and displacements as comparable. For as the Commission points out in its brief, in the context of the public *versus* private power conflict the attempted distinction is meaningless.

3. If the Commission should decide that, in any event, the public interest does not require the wheeling order requested here, it may not be necessary to reach the broader question.

"public utilities" as used in Parts II and III of the Power Act.

For the same reason that we felt Congress' attention was not focused on such cooperatives when it used the term "public utilities," we think it was also not so focused when it used the term "government instrumentality" in Section 201(f). Nothing in the legislative history of the Power Act indicates one way or the other whether REA-financed cooperatives were to be encompassed by the Section 201(f) exemption. Again, Congress simply did not intend that the Power Act treat of REA-financed cooperatives at all.

The question remains, however, whether the structure and financing of the cooperatives are such that they, nevertheless, are in fact government instrumentalities and should be considered such under Section 201(f). *Compare* United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). And, of course, while an entity may be considered a government instrumentality for certain purposes, it need not be so considered for all purposes. We hold here simply that East Kentucky, as an REA-financed cooperative, is not a government instrumentality for purposes of the Section 201(f) exemption in the Federal Power Act.

It is true that the Rural Electrification Act was an attempt by Congress to bring economical electric power to rural areas through rural electrification cooperatives, and that the Rural Electrification Administration, which makes low-interest loans to such incipient cooperatives, does exercise considerable supervision over them. But this connection with the REA is not, we think, of such magnitude as to make the cooperative borrowers instrumentalities of the federal government. The cooperatives do not perform an inherent governmental function,[4] nor have they become so assimilated or incorporated into government as to become one of its constituent parts.[5] The funds advanced to the cooperatives are not spent or used on behalf of government or in the performance of any governmental function. The benefits of the loan inure primarily to the cooperatives' constituent members. That the public interest in rural electrification is also served thereby is not enough to make the cooperatives themselves instrumentalities.[6]

REA-financed cooperatives are private nonprofit corporations organized for the benefit of their consumer-owners. They are neither operated nor controlled by any government, federal, state or local. Nor are they operated or controlled by the Rural Electrification Administration or any other government agency. The control and authority exercised over them by the REA relates primarily to the REA loan and the protection of the United States' security interest in the cooperatives' operations. But the voluntarily entered contract with REA does not, we think, alter the nature of the cooperatives' independent corporate existence. "The control reserved by the Government for protection of a governmental program and the public interest is not incompatible with the retention of the status of a private enterprise." Buckstaff Bath House Co. v. McKinley, 308 U.S. 358, 363, 60 S.Ct. 279, 281, 84 L.Ed. 322 (1939).

4. *See, e.g.,* Broad River Power Co. v. Query, 288 U.S. 178, 53 S.Ct. 326, 77 L.Ed. 685 (1933); Fox Film Corp. v. Doyal, 286 U.S. 123, 52 S.Ct. 546, 76 L.Ed. 1010 (1932); Susquehanna Power Co. v. State Tax Commission of Maryland, 283 U.S. 291, 51 S.Ct. 434, 75 L.Ed. 1042 (1931); State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261 (1905).

5. *See, e.g.,* United States v. Boyd, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964).

6. *See, e.g.,* Broad River Power Co. v. Query, *supra* Note 4; Susquehanna Power Co. v. State Tax Commission of Maryland, *supra* Note 4. All sorts of privately owned government authorized businesses serve the public interest but are not, for most purposes at least, thereby considered governmental instrumentalities. Consider, for example, radio and television stations licensed by the Federal Communications Commission.

In the proceedings before the Commission in *Dairyland* and in *Salt River*, neither the Secretary of Agriculture, who intervened, nor the Rural Electrification Administration itself ever contended that REA-financed cooperatives were instrumentalities of the United States Government. On the contrary, the Rural Electrification Administration has taken the position that cooperative-owned electric systems are "independent businesses" controlled by their "owner-managers." We agree that such cooperatives are, as presently organized and financed, not government instrumentalities under Section 201(f) of the Federal Power Act.

The Commission must now decide whether it can order Kentucky Utilities to wheel for East Kentucky and, if it can, whether it is in the public interest that it do so in this case.

Remanded for further proceedings.