**GARKANE POWER ASSOCIATION, a Rural Electric Cooperative, Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF UTAH, Milly O. Bernard, David R. Irvine and Brent H. Cameron, Commissioners of the Public Service Commission of Utah, Division of Public Utilities and CP National, Defendants.**

No. 17461.

Supreme Court of Utah.

April 11, 1984.

George K. Fadel, Bountiful, for plaintiff.

David L. Wilkinson, Atty. Gen., Craig R. Rich, Salt Lake City, for Div. of Public Services.

James L. Barker, Jr., Salt Lake City, for Comm. of Consumer Service.

David J. Jordan and Grant Macfarlane, Jr., Salt Lake City, for CPN.

PER CURIAM:

This case is a Writ of Review of a Report and Order of the Public Service Commission of Utah pursuant to U.C.A., 1953, § 54–7–16. The plaintiff, Garkane Power Association (Garkane), seeks reversal of the order by the defendant, the Public Service Commission (PSC), requiring that Garkane refund money received from wholesale sales of electric power to the defendant, CP National Corporation (CPN), under a contract between Garkane and CPN. We affirm.

Garkane is a cooperative association that owns and operates facilities for both generation and transmission of electric power in south-central Utah, primarily Wayne, Garfield, Paiute and Kane Counties. As an electrical cooperative, Garkane receives financing from the Rural Electrification Administration (REA). CPN is a public utility distributing power at retail to Utah consumers in Washington, Iron and Kane Counties, and to Arizona consumers in the town of Fredonia. Fredonia, Arizona, is four miles south of the Kane County, Utah-Arizona border and just seven miles south of CPN's only Kane County consumers in the town of Kanab, Utah. CPN does not have transmission facilities to serve its consumers in Kanab and Fredonia. Garkane does have transmission facilities in that geographical area. Therefore, since 1966, CPN has contracted with Garkane to sup-

ply and transmit power at wholesale to Kanab and Fredonia for CPN. CPN is not a member of the Garkane cooperative association and is Garkane's only wholesale customer.

Garkane sold power to CPN at a firm rate for ten years. When that contract expired in 1976, the parties entered an interim agreement during negotiations for a new contract. The interim arrangement specified that Garkane was to provide power to CPN with charges to "parallel the charges and provisions of Utah Power & Light Company's Resale Service Schedule RS-1" until "we can execute the new agreement."[1] On August 10, 1977, Garkane sent a "letter of agreement" to CPN, which CPN signed and subsequently filed with the PSC. This letter, the only documentation of the parties' new contract and the basis of the present controversy, provided (1) for both parties to undertake improvements in their facilities, (2) for a power exchange whereby CPN would supply Garkane's consumers in Colorado City, Arizona (two miles south of the Washington County, Utah-Arizona border), in exchange for a portion of the power supplied by Garkane to CPN's Kanab-Fredonia consumers, and (3) for the rates at which Garkane would supply power at wholesale to CPN:

> Garkane will sell power and energy hereunder at the monthly demand and energy rate set forth in the attached UP & L Rate Schedule RS-2, or any approved revision thereof, plus the appropriate fuel adjustment charge each month ....

Attached to the letter was a schedule entitled "Schedule RS-2 Resale Service-High Voltage" issued by Utah Power & Light Company (UP & L). CPN sent a copy of this letter of agreement to the PSC on October 31, 1977. The PSC took no action.

From August 1976 to August 1977, CPN paid the interim RS-1 rate. From September 1977 to November 1977, CPN paid the RS-2 rate. In November 1977, UP & L raised its RS-2 rate. Garkane's billing to CPN reflected the corresponding increase, which CPN paid apparently without protest

from December 1977 through October 1978. In July 1978, the Federal Energy Regulatory Commission (FERC) issued an order which reduced UP & L's wholesale rates (both RS-1 and RS-2), specified new rates with a lower rate of return, and ordered a refund for the period from August 1, 1976, to October 25, 1978. Pursuant to the FERC order, Garkane received a refund of approximately $28,000 from UP & L for the power it had purchased for resale to CPN during the period of the higher, disallowed rates.

Both Garkane and CPN are experienced electric utilities and were well acquainted with the practices of the FERC during the time in question. In general, the FERC requires all utilities subject to its jurisdiction to file rate changes that become effective subject to subsequent hearing and refund. If the rate is found to be excessive on the basis of evidence offered at the hearing, the FERC determines a just and reasonable rate, which is made effective retroactively to the date of the original filing. The FERC also orders the utility to pay to its customers refunds of the difference between the provisional and final rates received during the time between the original filing and the FERC order. This time is referred to as the "refund period."

After the July 1978 order from the FERC, which reduced UP & L's RS-1 and RS-2 rates and specified a period for which UP & L would owe refunds to its customers, CPN calculated the refund it considered due from Garkane by applying the RS-1 and RS-2 rate reduction to *all* sales of power from Garkane to CPN, plus interest, for a total refund of $161,568.90. Garkane refused to pay, asserting that, at most, the reduction applied to the portion of power sold to CPN that had been purchased from UP & L, i.e., the power worth $28,000, which amount was refunded to Garkane by UP & L. In the meantime, CPN paid for power supplied by Garkane at the new, reduced RS-2 rate.

---

1. Letter from CPN to Garkane, March 9, 1976.

In April 1979, while this dispute continued, CPN requested an acknowledgment or approval from the PSC of the August 1977 "letter of agreement." Receiving no response, CPN again requested PSC approval in August. The refund dispute came to the attention of the Division of Public Utilities, and on September 13, 1979, the Division filed a petition before the PSC for "an order to show cause why a refund should not be made by Garkane Power Association to CP National Corporation, and why CP National Corporation should not pass-through the refund to its customers in Kane County, Utah." On October 1, 1979, the PSC notified CPN by letter that the PSC approved the August 10, 1977 letter of agreement between Garkane and CPN and would take no formal action with regard to the matter. The Order to Show Cause was issued on November 26, 1979, and a hearing was held before the PSC on January 18, 1980. At that hearing, Garkane challenged the jurisdiction of the PSC. The parties were requested to submit briefs on that issue, and another hearing was set for March 3, 1980.

At both hearings, the PSC heard testimony regarding the parties' dealings with each other and their intentions at the time the August 1977 letter of agreement was signed. Documents were presented showing the parties' billing and payment history. Testimony was heard regarding the general nature of Garkane's business and sources of power. CPN argued that the parties intended the RS-2 rate to "track" with rate schedule revisions instigated by UP & L and that the "tracking" process included the possibility of a rate reduction and possible refunds, because both parties knew that the UP & L rates were subject to those eventualities under FERC procedures. CPN asserted that PSC jurisdiction to order a refund is based on U.C.A., 1953,

§ 54-7-20(1),[2] which provides that the PSC may order reparations when a public utility has charged an amount in excess of the rate on file with PSC. When the FERC determined that UP & L's RS-1 and RS-2 rates were excessive, CPN argued, this meant that the RS-1 and RS-2 rates as charged by Garkane were excessive and had been from the beginning. Thus, Garkane had been charging in excess of the (revised) rate on file, and a refund was due based on the total power sold to CPN. Garkane contended that it had never charged rates in excess of the filed rate. Because the FERC's determination that UP & L's rates were excessive was based on evidence of UP & L's financial requirements, Garkane argued that the retroactive application of a lower rate and the ordering of a refund were inapplicable to Garkane's rate, i.e., the FERC order was directed to UP & L only, regardless of parallel charges being made by Garkane. Garkane further asserted that, as it had never charged in excess of the filed rate, the PSC was without jurisdiction to order a refund. In addition, Garkane argued that since the contract in question dealt with an interstate wholesale transaction, the PSC was without jurisdiction because of the FERC's exclusive jurisdiction regarding the regulation of interstate wholesale rates.

On September 23, 1980, the PSC issued its report and order. In its Findings of Fact, the PSC stated that the Garkane-CPN contract was "made in contemplation of rate adjustments by FERC and that UP & L schedules adopted by the parties were expressly subject to increases or decreases and refunds if the rates were adjusted downward," that Garkane had charged in excess of the filed contract rate, which was decreased retroactively by the FERC order, and that CPN had correctly calculated the

**2.** Section 54-7-20(1) reads as follows:

When complaint has been made to the commission concerning any rate, fare, toll, rental or charge for any product or commodity furnished or service performed by any public utility, and the commission has found, after investigation, that the public utility has charged an amount for such product, commodity or service in excess of the schedules, rates and tariffs on file with the commission, or has charged an unjust, unreasonable or discriminatory amount against the complainant, the commission may order that the public utility make due reparation to the complainant therefor, with interest from the date of collection.

amount of the refund as $161,568.90. In its Conclusions of Law, the PSC declared that it had jurisdiction over the parties and the subject matter, restated its interpretation of the contract, and concluded that this was an appropriate case for reparations. Garkane was ordered to pay to CPN $161,568.90 with interest at 10% per annum from the date of the order.

The scope of review by this Court with regard to an order or decision by the PSC is determined by statute and has been restated in our case law. *See* U.C.A., 1953, § 54-7-16; *Utah Dept. of Admin. Services v. PSC*, Utah, 658 P.2d 601 (1983) ("Wexpro II"); *W.S. Hatch Co. v. PSC*, 3 Utah 2d 7, 277 P.2d 809 (1954); *Bamberger Electric R. Co. v. PUC*, 59 Utah 351, 204 P. 314 (1922). On the basis of our review of the record as well as state and federal law, we hold that the PSC did have jurisdiction over the parties in this instance and that its statutory authority was properly exercised in ordering the refunds here. We first address the jurisdiction issue.

### I.

The issues in this case are raised against a background of developing technology and changing regulatory concerns.[3] Initially, electricity users were so few that rates were controlled by the need to compete with other power sources. No other regulation was considered necessary. By 1900, electric companies had grown in size and number, and electric power was viewed as a necessity. The companies came to be viewed as "natural monopolies," that is, industries which operate more efficiently and effectively without the necessity of competing for a market. The first state public utility commissions with authority to regulate electric companies appeared in 1907, and by 1922, regulatory agencies existed in all of the then forty-eight states but Texas, which left utility regulation to municipalities until 1975. To insure effi-

cient use of resources, public utilities were, and are, granted exclusive franchises and regulated to prevent exploitation by the producer while encouraging economies of scale. Although the Federal Power Commission (FPC) was created in 1920 as part of the Federal Water Power Act, it functioned primarily as the licensing authority for the construction of dams and reservoirs on navigable waters. For the most part, electric utility regulation was left to the states.

Technological advances and growth in the industry soon led to the interstate sale of power. In 1927, in *PUC v. Attleboro Steam & Electric Company*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927), the Supreme Court held that the regulation by the public utility commission in one state of wholesale rates charged to a public utility in another state was a "direct burden" on interstate commerce and that such regulation could be undertaken only by Congress. It took Congress eight years to fill the so-called "Attleboro gap" with the Federal Power Act of 1935. The FPC was given authority to regulate the rates for wholesale power in interstate commerce and authority to promote coordination among public utility systems "[f]or the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources." 16 U.S.C. § 824a (1982).

Since 1935, continued technological development and government encouragement of integrated public utility systems have led to the development of huge multi-state systems. These large-scale systems offer technical and economic advantages of direct benefit to the consumer: decreased operating costs resulting from the centralized dispatch of electric power; decreased costs of maintaining a reserve of electric

---

**3.** For this review of regulatory history and policy, we are particularly indebted to: Hjelmfelt, "Exclusive Service Territories, Power Pooling and Electric Utility Regulation," 38 Fed.B.J. 21 (1979); Lagassa, "State Utility Commissions as Vestigial Organs: The Need for Regional Governance of Electric Utilities," 28 Kan.L.Rev. 291 (1980); Comment, "The National Energy Act and State Commission Regulation," 30 Case W.Res.L.Rev. 324 (1980).

power to cover emergencies or routine maintenance; decreased costs of supplying peak load demands; decreased costs of construction through shared financing; and use of larger, more efficient generation and transmission facilities. These extensive regional systems, which are not contiguous with state lines, have created a regulatory gap more subtle than the "Attleboro gap," but of potentially more disruptive effect. The FPC exercises its authority primarily in the regulation of interstate rates, while the states supervise local distribution to consumers. Before 1968, there were no regional authorities beyond voluntary associations of companies or power pools. In 1965, a power failure lasting up to seven and one-half hours covered most of six northeastern states. In its report, *United States Federal Power Commission, Northeast Power Failure—November 9 and 10, 1965* (1965), the FPC identified inadequate regional interconnections within the Canada-United States Eastern Interconnection as the cause of the blackout and expressed the need to fill the regulatory gap:

> When the Federal Power Act was passed ... no special provision was made for jurisdiction over reliability of service for bulk power supply from interstate grids, the focus of the Act being rather on accounting and rate regulation. Presumably the reason was that service reliability was regarded as a problem for the states. Insofar as service by distribution systems is concerned this is still valid, but the enormous development of interstate power networks in the last thirty years requires a reevaluation of the governmental responsibility for continuity of the service supplied by them, since it is impossible for a single state effectively to regulate the service from an interstate pool or grid.

*Id.* at 6.

The FPC report resulted in the establishment in 1968 of the National Electric Reliability Council. Members of the National Council and its regional subcouncils meet periodically to discuss matters of common concern and to exchange information. The councils, however, are primarily advisory in nature. The FPC requested that Congress grant it the authority to order interconnections and compel coordination on its own motion. However, Congress declined, preferring to leave such arrangements to the voluntary efforts of the public utilities until 1978, when that authority was granted as part of the National Energy Act (NEA). Under the NEA, the FERC[4] may order the interconnection of the transmission facilities of two electric companies or order "wheeling," which is the transfer of power from one utility to another over the facilities of an intermediate utility. 16 U.S.C. § 824i–k (1982). In addition, the FERC is also authorized to override any state law or regulation that "prohibits or prevents the voluntary coordination of electric utilities." 16 U.S.C. § 824a–1(a) (1982).

Although the NEA broadened federal authority over electric utility regulation, it is still true that no single regulatory body has comprehensive regulatory jurisdiction. Each state remains primarily responsible for regulating the distribution systems that deliver power directly to consumers within its borders through licensing, rate regulation and plant site review. State utility commissions are clearly best able to address state concerns such as local rates, health and safety, unemployment, and environmental issues. At the same time, the NEA's policy of encouraging regional and national coordination to achieve increased conservation and efficiency can produce direct benefits to local consumers through cost reduction and increased reliability. While state agencies are traditionally vulnerable to pressure from environmental groups, large utilities, and communities whose plant siting policy is "anywhere but here," a state regulatory agency that refuses to adopt a regional perspective runs the risk of denying benefits to the citizens

---

**4.** The jurisdiction of the FPC over wholesale electric power rates was transferred to the FERC by section 301(b) of the Department of Energy Organization Act. *See* 91 Stat. 565 (1977), 42 U.S.C. § 7172(a)(1)(B) (Supp. V 1981).

of its state and increasing the likelihood of federal preemption of its authority.

As advances in technology and growth in size and complexity have made regulation of the utility industry increasingly difficult, it has also become more difficult to make individual determinations of the occurrence of interstate sales of power. In 1927, no one doubted that the direct transfer of power from a Rhode Island utility to a Massachusetts utility was electric power in interstate commerce. *See PUC v. Attleboro Steam & Electric Co., supra.* In *Jersey Central Power & Light Co. v. FPC,* 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258 (1943), the Supreme Court also found that energy moved in interstate commerce. In that case, Jersey Central supplied power to another New Jersey utility, Public Service Electric & Gas Co., which had exchange arrangements with Staten Island Edison Corp., a New York utility. Public Service transferred power to Staten Island through a "bus," which is an electrical junction where current is redistributed from incoming conductors to outgoing conductors. The FPC was able to show that there were occasions when Staten Island drew power from the bus when only Jersey Central was supplying power, thus establishing that Jersey Central energy moved in interstate commerce. In *Connecticut Light & Power Co. v. FPC,* 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150 (1945), the Supreme Court, in construing the § 824(b) grant of jurisdiction to the FPC, stated that it was Congress' intention that "[f]ederal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than legalistic or governmental, test." *Id.* at 529, 65 S.Ct. at 756.

This test was repeated in *FPC v. Southern California Edison Co.,* 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964), in which the Supreme Court unanimously held that § 201(b) of the Federal Power Act (16 U.S.C. § 824(b) (1982)) gives the FPC jurisdiction over all wholesale sales of electric energy in interstate commerce not expressly exempted by the statute itself. In that case, the City of Colton, California, which purchased its entire supply of power from Southern California Edison (Edison), petitioned the FPC to exercise jurisdiction over the Edison-Colton sales. Colton resold the bulk of the power it purchased to residential, commercial and industrial consumers. Edison, a California utility operating in central and southern California, obtained some of the power that it sold in California from Nevada and Arizona. The FPC found that out-of-state energy from Hoover Dam was included in the energy sold to Colton and found . jurisdiction to regulate the rates charged by Edison. The Court of Appeals for the Ninth Circuit set aside the FPC order, arguing that even assuming out-of-state energy reached Colton, the basis for FPC jurisdiction under the Federal Power Act was limited to those transactions constitutionally beyond the regulation of the state because of a direct burden on interstate commerce. The Court of Appeals analyzed the impact of state regulation of the Edison-Colton sales on the national interest in commerce and concluded that the FPC had no jurisdiction because state regulation would not prejudice the interests of any other state. The Supreme Court reversed:

[O]ur decisions have squarely rejected the view of the Court of Appeals that the scope of FPC jurisdiction over interstate sales of gas or electricity at wholesale is to be determined by a case-by-case analysis of the impact of state regulation upon the national interest. Rather, Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction, making unnecessary such case-by-case analysis. This was done in the Power Act by making FPC jurisdiction plenary and extending it to *all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States.*

376 U.S. at 215–16, 84 S.Ct. at 651–52 (emphasis added). Edison admitted that it was a "public utility" within the meaning of 16 U.S.C. § 824(e) by virtue of its ownership of two transmission lines from Hoover Dam to a substation in California. However, the Supreme Court stated that Edi-

son's status as a public utility was not determinative of whether the FPC had jurisdiction over the *rates* in the Edison-Colton sale. Instead, the Court relied on the finding that out-of-state energy was included in the sale to Colton.

In *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972), the Supreme Court followed an even more insubstantial flow of electric energy to find energy in interstate commerce sufficient to bring a utility within the definition of "public utility" in 16 U.S.C. § 824(e). Florida Power & Light (FP & L) is Florida's largest public utility, but because it is concentrated in the southern part of Florida's peninsula and because of the threat of hurricane damage, FP & L is unusually independent of other utilities, having no direct connections to any out-of-state utility. However, FP & L is a member of the Florida Pool and thus is interconnected with several other Florida utilities, including Florida Power Corp. Florida Power Corp. interconnects with Georgia Power Co. and regularly exchanges energy with it. Georgia Power Co. transmits power into and out of Florida. The records showed that on numerous occasions, FP & L-Florida Power Corp. transfers coincided with Florida Power Corp.-Georgia Power Co. transfers. The Supreme Court held that FP & L power "commingling" in a bus, with power leaving the bus for out-of-state destinations, was sufficient to establish "that *some* FP & L power goes out of state." *Id.* at 461, 92 S.Ct. at 643 (footnote omitted) (emphasis in original). This was held sufficient to sustain FPC jurisdiction to require FP & L to maintain its accounts in accordance with the Commission's Uniform System of Accounts. The Court explained further:

> If any FP & L power has reached Georgia, or FP & L makes use of any Georgia power, no matter how small the quantity, FPC jurisdiction will attach because it is settled that Congress has not "conditioned the jurisdiction of the Commission upon any particular volume or proportion of interstate energy involved,

> and we do not ... supply such a jurisdictional limitation by construction."

*Id.* at 461 n. 10, 92 S.Ct. at 643 n. 10 (citations omitted).

In the instant case, Garkane obtains electric power from its own generation facilities in Utah and from other sources such as UP & L. While the record is not entirely clear, it is apparent that at least some of Garkane's power comes from the Glen Canyon Dam generation facilities in Arizona through Garkane's own transmission lines. It is this "commingled" power that Garkane sells at wholesale to CPN for use by consumers in Utah and Arizona. If we were to apply the "bright line" test articulated in *FPC v. Southern California Edison Co., supra,* to these facts, we would have to find exclusive federal jurisdiction. To paraphrase the quotation from the *Florida Light & Power* case, *supra:* if CPN makes use of *any* Arizona power in Utah or any Utah power in Arizona, no matter how small the quantity, FPC jurisdiction will attach because there is energy in interstate commerce at wholesale and it is settled that Congress has not conditioned the jurisdiction of the Commission upon any particular volume or proportion of interstate energy involved. The circumstances in the instant case bear an even closer resemblance to the facts in *FPC v. Southern California Edison Co., supra.* There, as here, both buyer and seller were from a single state, but at least *some* energy brought from out-of-state by the seller utility was included in the sale for resale to the buyer utility. The Supreme Court declared its agreement with the FPC that under those circumstances "the FPC has 'no discretion to reject that jurisdiction'" to regulate the seller's rates to the buyer. *FPC v. Southern California Edison Co.,* 376 U.S. at 209 n. 5, 84 S.Ct. at 648 n. 5 (quoting *City of Colton v. Southern California Edison Co.,* 26 F.P.C. 223, 236 (1961)). This jurisdiction is premised on the Federal Power Act and not on "the impact of state regulation upon the national interest" under the Commerce Clause. The impact analysis, argued extensively by the

PSC and CPN in this case, was specifically rejected by the Supreme Court.

However, there is another line of authority, dealing with REA-financed cooperative associations, which is relevant to the question of jurisdiction in this case. The defendants correctly point out that the FPC has specifically disclaimed jurisdiction over REA-financed cooperative associations. In *Dairyland Power Cooperative,* 37 F.P.C. 12 (1967), the FPC issued an opinion declaring that REA-financed electrical cooperative associations fell outside of its jurisdiction over "public utilities" as defined in the Federal Power Act. The FPC did not base its opinion, however, on the language of the Act that would seem to include cooperative associations [5] or on legislative history which is nonexistent regarding electrical cooperatives. The FPC considered the history and policies of both the Federal Power Act of 1935 and the Rural Electrification Act of 1936 together with the lack of Congressional response to its 30-year administrative practice of not regulating cooperatives and concluded that it was not the intention of Congress to regulate REA-financed cooperatives.[6]

In *Salt River Project Agricultural Improvement and Power District v. FPC,* 391 F.2d 470 (D.C.Cir.1968), the court affirmed the FPC dismissal of a cooperative association's petition for FPC jurisdiction following the FPC's *Dairyland* decision. The court reviewed the policies which had led to the nonregulation of REA-financed cooperatives, finding two major reasons why such cooperatives should remain free of FPC regulation. First, the court pointed out that the Federal Power Act and the Rural Electrification Act were aimed at entirely different problems. In the absence of restraint by regulation or competition, the "natural monopoly" power companies had become characterized by abusive and manipulative practices detrimental to both investors and consumers. These abuses were not associated with the nonprofit consumer-owned cooperatives financed by the REA. The purpose of the REA was to bring electric power to rural areas avoided by profit-seeking public utilities through assistance to member-owned cooperatives. Among other things, the REA provided low-interest loans, supervised construction plans, furnished retail rate schedules and assisted in finding electric energy at reasonable costs. REA supervision, it was felt, was sufficient. Second, the court found FPC regulation unnecessary in the specific area of rate-making:

> [I]t is in [this area] that, by their structural nature, the cooperatives are effectively self-regulating. They are completely owned and controlled by their consumer-members, and only consumers can become members. They are nonprofit.

*Id.* at 473 (footnote omitted).

We acknowledge that the policy arguments expressed in the *Dairyland* and *Salt River* decisions do not necessarily militate against federal regulation in this case. Neither decision contemplated interstate

---

5. In *Salt River Project Agr. Improvement and Power Dist. v. FPC,* 391 F.2d 470 (D.C.Cir.1968), the court commented: "Admittedly REA cooperatives ... do seem to fall within the ambit of the Act's central phrase, 'public utilities.'" *Id.* at 474. In a footnote, the court continued:

> Section 201(e), 16 U.S.C. § 824(e), defines "public utility" to include "any person who owns or operates facilities subject to the jurisdiction of the Commission ...." ... Section 3(3), 16 U.S.C. § 796(3), defines "corporation" to include "any corporation, joint-stock company, partnership, association, business trust, [or] organized group of persons whether incorporated or not ...." Section 201(b), 16 U.S.C. § 824(b), provides, in pertinent part, that the "Commission shall have jurisdiction over all facilities for [the] transmission [in interstate commerce] or sale [in interstate commerce at wholesale] of electric energy ...."

*Id.* at 474 n. 10.

6. The FPC concluded, alternatively, that even if the cooperatives were public utilities under the Act, they were exempt as instrumentalities of the government under § 201(f) of the Federal Power Act, 16 U.S.C. § 824(f). *See Dairyland Power Cooperative,* 37 F.P.C. 12 (1967). In *City of Paris, Kentucky v. FPC,* 399 F.2d 983 (D.C.Cir. 1968), however, the court held that REA-financed cooperatives are not government instrumentalities for purposes of the Federal Power Act.

wholesale sales of power by a cooperative to a *nonmember* utility. The fact that Garkane is member owned and operated provides no assurance of fair treatment to CPN or its consumers as contemplated in the *Salt River* case, and Garkane is not obligated to operate at cost with regard to sales to CPN. By contracting to sell power at wholesale to CPN, Garkane arguably lost much of its distinctive character as a cooperative. The same policy arguments which led to the *Dairyland* and *Salt River* decisions could therefore weigh in favor of federal regulation here. CPN is not protected by the self-regulating aspects of Garkane's structural nature, nor has the REA exercised any supervision over this transaction. The REA has never functioned as a rate-making agency for the cooperatives it finances, rather:

> The control and authority exercised over them by the REA relates primarily to the REA loan and the protection of the United States' security interest in the cooperatives' operations .... [T]he voluntarily entered contract with REA does not ... alter the nature of the cooperatives' independent corporate existence.

*City of Paris, Kentucky v. FPC*, 399 F.2d 983, 986 (D.C.Cir.1968). Garkane has contracted here as any noncooperative public utility. Furthermore, Garkane and CPN have voluntarily contracted to construct and coordinate facilities of mutual benefit, to exchange electric power, and to transmit power in an interstate region presumably because they can do so more efficiently and economically together than they can separately. It would seem that these transactions could be appropriately regulated by a federal agency rather than by a state agency whose authority extends only to the protection of the interests of its own citizens. In addition, federal regulation of these transactions would be in accord with the National Energy Act of 1978, in which Congress not only expressed encouragement for voluntary regional cooperation, but also gave the FERC authority to order involuntary interconnections, wheeling, and even the power to override inhibiting state regulations.

Notwithstanding the foregoing considerations, in the recent case of *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission,* — U.S. —, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983), the United States Supreme Court clearly expressed its preference for state regulation of REA-financed cooperative associations. The Arkansas Electric Cooperative Corporation (AECC) was an association of seventeen cooperatives, all of them distributors of electric power to their consumer-members in Arkansas. The Arkansas PSC and the Arkansas Supreme Court recognized that although the AECC obtained most of its power from generating plants in Arkansas, some of the energy that AECC bought and sold might cross state lines because of its participation in a multi-state power grid. The Arkansas court upheld the state PSC's assertion of jurisdiction on the ground that the function and purpose of AECC is local, "having its paramount impacts and consequences in Arkansas and having little or no relation to any other place." *Arkansas Public Service Commission v. Arkansas Electric Cooperative Corp.*, 273 Ark. 170, 618 S.W.2d 151, 153 (1981). The United States Supreme Court affirmed the Arkansas decision, declining to apply the "bright line" distinction articulated in *FPC v. Southern California Edison, supra,* and relying instead on a broader balancing test described in *Illinois Gas Co. v. Public Service Co.*, 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371 (1942):

> In the absence of any controlling act of Congress, we should now be faced with the question *whether the interest of the state* in the present regulation of the sale and distribution of gas transported into the state, *balanced against the effect of such control on the commerce in its national aspect, is a more reliable touchstone for ascertaining state power than the mechanical distinctions on which appellee relies.*

*Id.* at 506, 62 S.Ct. at 387 (emphasis added). The "mechanical distinctions" referred to are the distinctions between interstate and intrastate transactions and between sales

for resale and sales to consumers. These distinctions were used in the *Attleboro* decision to limit the reach of state regulation of utilities: states could not regulate interstate sales for resale. After Congress granted that power to the FPC, the Supreme Court construed the statutes, rather than the Commerce Clause, in a series of cases which included *FPC v. Southern California Edison Co.* and *FPC v. Florida Power & Light Co.*, discussed above. Typically, these cases declared that "[f]ederal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than legalistic or governmental, test." *Connecticut Light & Power Co. v. FPC*, 324 U.S. at 529, 65 S.Ct. at 755.

In *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, supra*, however, the Supreme Court found that Congress intended the REA, not the FPC, to regulate cooperative associations and that when the federal power to regulate interstate commerce is unexercised, the balance-of-interests test is the appropriate one. Referring to the *Attleboro* test as formalistic, mechanical, categorical and anachronistic, the Supreme Court found that in light of AECC's wholly in-state distribution to local cooperatives, the "legitimate local public interests" weighed in favor of state regulation. The Court recognized that although state regulation might have an "incidental effect on interstate commerce," nevertheless that burden does not outweigh the local benefits. *Arkansas Electric, supra*, 103 S.Ct. at 1917–18.

■ In view of the unequivocal language in the above case construing Congressional intent with regard to REA cooperatives, we must conclude that the Supreme Court would also affirm the PSC assertion of jurisdiction in the present case. We reach this conclusion despite factual distinctions between the *Arkansas Electric Cooperative Corp.* case and the case before us,

believing that those factual distinctions would not cause a different result under the policy set forth by the U.S. Supreme Court. We therefore hold that the PSC had jurisdiction over the parties in this case.[7]

### II.

■ We have held that the Utah PSC could exercise jurisdiction over the parties in this case. For the reasons discussed below, we further hold that the PSC did not exceed its statutory authority in ordering a refund and that the order was supported by the necessary factual findings which justify exercise of PSC authority to interpret a contract.

The critical issue before the Commission in this action was whether the Garkane-CPN contract, which based the rate for electricity on the UP & L rate, contemplated retroactive adjustments to the Garkane-CPN rate when the UP & L rate was decreased by a FERC refund order. The Commission found that the contract should be so construed.

■ In *Committee of Consumer Services v. PSC*, Utah, 638 P.2d 533 (1981), this Court examined various approaches from different jurisdictions as to how and whether refunds were permissible under the common law and laws regulating public utilities. Without replowing the ground there covered, it is sufficient to note that § 54–7–20 of our public utilities code specifically empowers the PSC to order reparation for charges made by a public utility which are "in excess of the schedules, rates and tariffs on file with the Commission . . . ." The Commission found that the rates that had been charged under the Garkane-CPN contract were in excess of "the schedule of the . . . rates . . . on file with the Commission."

It is, of course, true that the Commission had never found that the rate established

---

7. During the 1984 Budget Session, the Utah Legislature apparently divested the Commission of its jurisdiction over wholesale electric cooperatives in regard to rate regulation. S.B. No. 35, effective March 29, 1984, provides:

54–4–1.1. The commission does not have the authority under the provisions of this title to regulate, fix or otherwise approve or establish the rates, fares, tolls, or charges of a wholesale electrical cooperative.

in the Garkane-CPN contract was a just and reasonable rate. However, the public utilities code does not require that. Section 54–4–1 (Supp.1981) makes clear that the Commission is "vested with power and jurisdiction to supervise and regulate every public utility in this state, and to supervise all of the businesses of every such public utility ... and to do all things ... necessary or convenient in the exercise of such power and jurisdiction." Therefore, although the Commission had not previously approved the rates, § 54–7–20, in conjunction with the broad conferral of authority under § 54–4–1, authorized the Commission to enter an order of reparation.

■ There can be no doubt that not every contract entered into by a public utility is subject to the jurisdiction of the PSC. Many contracts for the purchase of supplies and equipment, and other contracts dealing with the ordinary conduct of a business, are contracts that could be litigated only in a district court and not before the PSC. However, this dispute is clearly one that involves the validity of electric rates— whether Garkane was entitled to charge CPN the rate initially stated in the UP & L tariffs or the roll-back rate. We believe the PSC was competent to rule on this issue and had the statutory authority to do so.

■ Also of substantial significance in determining how the Commission's authority should be construed is the fact that the power to order reparations under § 54–7–20 is a power that is not the equivalent of a contract action for damages in a district court. Orders of reparation may be contingent upon conditions established by the Public Service Commission to assure that the fundamental, underlying policies of utility rate regulations are carried out. The Commission may fashion an order that protects the interests both of the co-op and the consumer. Thus, the Commission may order reparation over a period of time (if need be to protect the financial integrity of the co-op) upon condition that the monies received be passed through to the customers. A court has no such power.

■ The duty of the Public Service Commission is to exercise supervisory control over certain aspects of the businesses of public utilities for the purpose of securing two essential objectives in the promotion of the public interest. First, the Commission must deal with those subject to its jurisdiction in such a manner as to assure their continued ability to be able to serve the customers who rely upon them for essential services and products. Second, the Commission performs the extremely delicate, and not uncontroversial but nonetheless essential, function of balancing the interest of having financially sound utilities that provide essential goods and services against the public interest of having goods and services made available without discrimination and on the basis of reasonable costs. A large lump sum judgment entered by a district court for breach of contract, as could occur in any given case, could conceivably result in severe impairment of the financial integrity of the utility involved and even in its possible bankruptcy. That would be of no concern to a court in contract dispute. It is of major concern to the PSC.

■ In this case, the PSC found after hearing that "the contracts entered into between Garkane and CPN covering the time period in controversy adopt as the contract rates the UP & L RS schedules in effect from time to time as determined by the FERC." We are persuaded that this conclusion, by an agency experienced in establishing and interpreting provisions of utility rates, is reasonable and without error.

The order of the Public Service Commission is therefore affirmed in all respects. No costs awarded.

STEWART, Justice (concurring):

In my view, *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission,* — U.S. —, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983), is dispositive of the issue as to whether the PSC may exercise authority over Garkane Power Association

in this case. Neither the Rural Electrification Act nor the Commerce Clause of the United States Constitution precludes the exercise of that power. I fail to see the pertinence of the Court's discussion of *Public Utilities Commission v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927), and its progeny and the scope of the powers of the Federal Power Commission and the Federal Energy Regulatory Commission. It is the Rural Electrification Act, as the discussion in *Arkansas Electric* demonstrates, that is relevant and important to the decision in *Arkansas Electric*.

I concur in the remainder of the Court's opinion.

DURHAM, Justice (concurring and dissenting):

I concur in Part I of the Court's opinion, but dissent from Part II.

It is the contention of CPN and the PSC that Garkane charged unlawful rates because they were in excess of the contract rate filed with the PSC. The defendants reach this conclusion by their interpretation of the Garkane-CPN contract. Garkane asserts that the interpretation of contracts is a judicial function and that the PSC acted beyond its statutory authority. The PSC points to the statement of its general jurisdiction in U.C.A., 1953, § 54-4-1 (Supp. 1983), which provides that the PSC is "vested with power and jurisdiction to supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility ... and to do all things ... necessary or convenient in the exercise of such power and jurisdiction." There is no question that the PSC has the authority to investigate, interpret and even alter contracts. That question was settled in an early series of cases brought just after the enactment of Utah's Public Utility Act. In each case, the Public Utility Commission (PUC) found a contract, executed before the institution of the PUC, in violation of a subsequently filed rate. This Court upheld the PUC's alteration of the contracts, holding that the regulation of

public utility rates was an exercise of the state's police power and was not an unconstitutional impairment of contractual obligations. *See Utah Hotel Co. v. PUC*, 59 Utah 389, 204 P. 511 (1922); *Utah Copper Co. v. PUC*, 59 Utah 191, 203 P. 627 (1921); *U.S. Smelting, Refining & Milling Co. v. Utah Power & Light*, 58 Utah 168, 197 P. 902 (1921); *Union Portland Cement Co. v. PUC*, 56 Utah 175, 189 P. 593 (1920).

Nevertheless, the authority of the PSC to alter a contract is not unlimited. In *Arkansas Natural Gas Co. v. Arkansas Railroad Commission*, 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705 (1923), the Supreme Court stated:

The power to fix rates ... is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed the exertion of legislative power solely to that end is precluded by the contract impairment clause of the Constitution .... *It is the intervention of the public interest which justifies and at the same time conditions its exercise.*

*Id.* at 383, 43 S.Ct. at 388 (emphasis added). In 1956, the Supreme Court further explained the role of a regulatory agency with regard to contracts privately entered:

[W]hile it may be that the Commission may not normally *impose* upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.

*FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388

(1956) (emphasis in original) (citation omitted). *See also United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958); *Gulf States Utilities Co. v. FPC,* 518 F.2d 450 (D.C.Cir.1975); *Richmond Power & Light v. FPC* 481 F.2d 490 (D.C. Cir.1973).

In *Lemhi Tel. Co. v. Mountain States Tel. & Tel. Co.,* 98 Idaho 692, 571 P.2d 753 (1977), the Idaho Supreme Court, in considering the authority of the Idaho Public Utilities Commission to interpret a contract, quoted the above language from *Sierra* and concluded:

Before the Public Utilities Commission may involve itself with a contract between two utilities, it must find specifically that the contract is adverse to the public interest . . . .

. . . .

The Commission did not make a finding which would allow a conclusion of adversity to public interest. [Therefore,] [i]t lacked authority to construe or enforce the contract.

*Id.* at 697–98, 571 P.2d at 758–59. *See also Bunker Hill Co. v. Washington Water Power Co.,* 101 Idaho 493, 616 P.2d 272 (1980).

I find this reasoning persuasive. There must be something more than the presence of a public utility as a party to a controversy in order to remove a contract interpretation dispute—traditionally a matter for the courts—from its usual forum. That "something more" is the need to protect the public interest, which is the proper concern of the PSC.[1] In the instant case, the PSC investigated the Garkane-CPN contract to see if Garkane had charged rates in excess of those filed. To make this determination, the PSC received evidence regarding the formation of the contract and the parties' course of conduct under the contract. The PSC concluded that it was the intent of the parties that the rate

should "track" with the UP & L rate schedule attached to the letter of agreement. I agree that this finding of fact is supported by evidence in the record. The PSC, however, went on to conclude that because the rate "tracked" with UP & L rates that were subject to revision by the FERC, the Garkane-CPN rate was also subject to FERC orders, including the order of refunds, and that this effect was contemplated by the parties. I find no evidence or reasoning to support this conclusion of law. It is true that the UP & L schedules were subject to adjustment by the FERC since UP & L was subject to the FERC's jurisdiction and UP & L's schedules were on file with the FERC. However, the only express language in the Garkane-CPN contract that might possibly indicate the parties' contemplation of FERC-ordered refunds is found in the printed form portion of the UP & L schedule attached to the contract:

GENERAL TERMS AND CONDITIONS: Service under this Schedule will be in Accordance with the terms of the Electric Service Agreement between the Customer and the Company. The Electric Service Regulations of the Company on file with and approved by the regulatory authorities having jurisdiction, including future applicable amendments, will be considered.as forming a part of and incorporated in said Agreement. The rates prescribed herein are subject to revision upon approval of the regulatory authorities having jurisdiction.

This general language, clearly referring to UP & L agreements and regulations and never referring to refunds specifically, is insufficient to imply that the parties intended thereby to subject their contract to FERC regulation.

Furthermore, the entire investigation undertaken by the PSC in this case is an ordinary contract investigation into the in-

---

1. The Court's opinion cites the PSC's broad grant of power in § 54–4–1 as authority to interpret the instant contract. However, this general statement of the PSC's authority cannot expand specific authority spelled out under other stat-

utes. Neither can it expand the PSC's authority beyond the constitutional limits set in *Arkansas Natural Gas Co. v. Arkansas Railroad Commission,* 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705 (1923), and subsequent cases.

tent of the parties, a proceeding which a district court would be fully competent to conduct. The record shows no investigation into or consideration of the public interest aspects of the contract. In particular, there is no finding that Garkane's proffered refund and interpretation of the contract are adverse to the public interest. Such a factual finding, based on adequate evidence, is a prerequisite for the exercise by the PSC of its authority to interpret a contract, as discussed above. In this case, there was no more than a cursory inquiry regarding the impact of the proposed refund. In the PSC hearing, Garkane was asked where the funds would come from if Garkane were ordered to pay to CPN a refund larger than the one received from UP & L. Garkane replied that the funds would come "from the general funds of the Association and, of course, ultimately from our consumers." The PSC made no further inquiry regarding the effect of the refund on Garkane's member consumers, nor did the PSC investigate the possibility that the larger refund might require Garkane's member consumers to subsidize the rates of CPN's consumers. There was also no finding regarding the impact of the refund on continued coordination between the utilities, although Garkane pointed out that it would have difficulty making reasonable business plans if subject to FERC-ordered refunds based on UP & L financial requirements. The PSC's finding of fact no. 7 specifically found, "There is no evidence which would support a finding that adoption of the RS rates of UP & L resulted in an unreasonable or unjust rate." Since protection of the public interest was not considered and was apparently unnecessary, I would hold that the PSC acted beyond its authority in interpreting and attempting to enforce this contract. The parties would then be free to litigate their contract dispute in the district court, as would any other parties to a commercial contract. The method of distribution of a refund, should one be determined to be required by the contract, could then be heard and determined by the PSC if necessary.

Therefore, I would set the order of the PSC aside.